ESTATE OF HANNAH G. INGRAM, DECEASED.

[No. 4,993; decided December 13, 1886.]

Will.—Every Person Over the Age of Eighteen Years, of Sound Mind, may, by last will, dispose of all his estate remaining after payment of his debts.

Will.—A Person is of Sound and Disposing Mind who is in the possession of all the natural mental faculties of man, free from delusion, and capable of rationally thinking, reasoning, acting and determining for himself. A sound mind is one wholly free from delusion. Weak minds differ from strong minds only in the extent and power of their faculties; unless they betray symptoms of delusion their soundness cannot be questioned.

Will—Delusion.—It is not the Strength of a Mind which determines its freedom from delusion; it is its soundness.

Will—Delusion of Mind is a Species of Insanity.—The main character of insanity, in a legal view, is the existence of a delusion.

Will.—A Person is the Victim of Delusion when he pertinaciously believes something to exist which does not. Belief of things which are entirely without foundation in fact is insane delusion; that is, where things exist only in the imagination of a person, and the non-

existence of which neither argument nor proof can establish in his mind.

**Will.—If a Person is Under a Delusion, though there is but Partial Insanity,** yet if it is in relation to the act in question, it will defeat a will which is the direct offspring of that partial insanity.

**Will.—Belief Based on Evidence, However Slight, is not Delusion;** delusion rests upon no evidence whatever; it is based on mere surmise. The burden of proof is upon the party alleging insanity or insane delusion.

**Will.—A Will Produced by Undue Influence** cannot stand.

**Will.—Undue Influence is any Kind of Influence,** either through fear, coercion, or importunity, by which the testator is prevented from expressing his true mind. It must be an influence adequate to control the free agency of the testator. If a weak-minded person is importuned to such an extent that he has not sufficient strength of mind to determine for himself, so that the proposed script expresses the views and wishes of the person importuning, rather than his own, and is not his free and unconstrained act, it is not his will. Undue influence, or supremacy of one mind over another, is such as prevents that other from acting according to his own wish or judgment.

**Will—Undue Influence.—Neither Advice, Argument, nor Persuasion** will vitiate a will made freely and from conviction, though such will might not have been made but for such advice and persuasion. Neither does undue influence arise from the influence of gratitude, affection or esteem.

**Will.—If the Testator has Sufficient Memory and Intelligence** fairly and rationally to comprehend the effect of what he is doing, to appreciate his relations to the natural objects of his bounty, and understand the character and effect of the provisions of his will; if he has a reasonable understanding of the nature of the property he wishes to dispose of, and of the persons to whom and the manner in which he wishes to distribute it, and so express himself, his will is good. It is not necessary that he should act without prompting.

**Will.—Undue Influence may be Defined** as that which compels the testator to do that which is against his will, through fear or a desire of peace, or some feeling which he is unable to resist, and but for which the will would not be made as it is, although the testator may know what he is about when he makes the will, and may have sufficient capacity to make it.

**Will.—What would be an Undue Influence on One Man** might be no influence at all on another. This depends upon the capacity, in other respects, of the testator.

**Will.—Undue Influence must be an Influence Exercised in Relation** to the will itself, and not in relation to other matters or transactions.

But it need not be shown to have been actually exercised at the point of time that the will was executed.

**Will.—Undue Influence cannot be Presumed, but must be Proved,** and the burden of proving it lies on the party alleging it. Such evidence must often be indirect and circumstantial, for undue influence can rarely be proved by direct and positive testimony. The circumstances to be considered, stated,

**Will—Insane Delusion—Undue Influence.—The Evidence in this Case** reviewed at length and the conclusion reached, that the testatrix was the victim of an insane delusion, of which the instrument propounded was the offspring, and that the testatrix was unduly influenced to make the will in favor of proponent.

Geo. H. Perry and W. W. Bishop, for contestant, John W. Ingram, husband of testatrix.

J. M. Seawell, for contestants, Samuel F. Clough and others, nephews and nieces of testatrix.

Selden S. Wright and R. Thompson, for proponent, Junius L. Hatch.

COFFEY, J. On February 6, 1886, a petition was filed by Junius L. Hatch in this court, praying for the admission to probate of a certain document purporting to be the will of Hannah G. Ingram, deceased, which petition set forth that Hannah G. Ingram died on the 1st of February, 1886, in this city and county, where she was at that date a resident, leaving a last will and testament in the possession of Junius L. Hatch, who was named therein as executor and principal devisee and legatee, the others being Samuel F. Clough, James A. Clough, Olympia Wilson, Lillie D. Hatch and John W. Ingram. That the next of kin of the testatrix and heirs at law were said John W. Ingram, the husband of decedent, residing at San Francisco, Samuel F. Clough, James A. Clough, nephews, all residing in this state.

That at the time said will was executed, February 13, 1885, the testatrix was of the age of fifty-two, and other-wise competent to make a will. The will is in the handwriting of the proponent, signed by the testatrix, and attested by the subscribing witnesses, according to the statute in such case made and provided, and the petitioner further prays that letters testamentary be issued to him.

The will provides (1) that all the just debts and funeral expenses be paid; (2) the testatrix gives to her husband, John W. Ingram, the sum of $5; (3) to her nephew, Samuel F. Clough, $5; (4) to her nephew, James A. Clough, $5; (5) to Mrs. Olympia Wilson, of Farback, Germany, formerly France, the sum of $10 per month, to be paid monthly out of her estate by her executor during the legatee's natural life; (6) she gives to Lillie D. Hatch, the daughter of said J. L. Hatch, executor, all her personal property, consisting of clothing, books, pictures, jewelry, etc.; (7) she directs that an appropriate monument be erected by her executor to her first husband John Dominic Wilson, and herself, in her lot in the Odd Fellows' Cemetery, of such cost and character as her executor may approve, to be paid for out of her estate; (8) she gives, devises and bequeathes to Junius L. Hatch, journalist, now of San Francisco, her house and lot No. 1724 Hyde street, including the cottage in the rear, No. 1235 Vallejo street, and she also makes the said Junius L. Hatch her residuary legatee, and finally nominates the said Junius L. Hatch the executor of her will without bonds.

The will purports to have been executed on the 13th of February, 1885, in the presence of Amanda Arnold and Algernon Hopkins.

On February 16, 1886, J. W. Ingram filed an opposition to the admission of this instrument to probate, on the grounds, first, that he was the husband of the deceased at the time of her death, having been married to her on the thirtieth day of July, 1884; that at the time of her death she possessed real estate and personal property of about $15,000 in value, and that at the time the said Hannah G. Ingram executed the said will she was not of sound and disposing mind, and was not competent to execute the said will by reason of her unsoundness of mind, and that, at that time, her signature was obtained by means of threats made by one Hatch, the person named in said instrument as the residuary legatee; further, that in order to obtain said signature, said Hatch falsely and fraudulently, and with intent to deceive said Hannah G. Ingram, and to prejudice and defraud the opponent, represented to said Hannah G.

Ingram that he, the opponent and husband of decedent, was unfaithful to his marriage vows, and that he was an idle and dissolute person; and the petitioner further alleged that the said Hannah G. Ingram believed the said false and fraudulent representations of said Hatch to be true; and further, the opponent alleged that from the date of the execution of the said purported will up to the time of the death of the said Hannah G. Ingram, the said Hatch falsely and fraudulently and with intent to unduly influence the mind of said Hannah G. Ingram, and with intent to weaken and destroy the love and affection borne by the said Hannah G. Ingram toward the opponent, her husband, continued to represent and declare that the opponent was associating with lewd women and was unfaithful and untrustworthy, and was not a fit and proper person to associate and live with said decedent, and was not a fit and proper person to whom the property and estate of said decedent should be bequeathed; and further, opponent alleged that said deceased was influenced by false and fraudulent representations of said Hatch, and, believing them to be true, forced the opponent, her husband, to leave said deceased, and the said Hatch caused said deceased to remain away from opponent, her husband, and to conceal her whereabouts from opponent, her husband, and at the time of the death of the said Hannah G. Ingram, and for a long time prior thereto, the whereabouts of said deceased were unknown to opponent, her husband, and said deceased so conducted herself, owing to the representations and influence of said Hatch, as hereinbefore set forth. The opponent therefore prayed that the probate of the purported will be denied, and that he be appointed administrator of the estate of said Hannah G. Ingram.

On February 25, 1886, Samuel F. Clough, James A. Clough, Lulu B. Clough and Albatena M. Weaver filed an opposition on their own behalf, alleging that they are the next of kin and heirs at law of Hannah G. Ingram, deceased, being her nephews and nieces, and alleging as grounds of opposition all of the statutory causes, the issue of undue influence being tendered in these words:

"That said alleged will and testament was procured to be made by said Junius L. Hatch by undue influence exerted

by him upon said Hannah G. Ingram, as follows, to wit: 'That said Hannah G. Ingram, prior to and at the time of making said alleged will and testament, was of unsound mind; that prior to and at the time of the making of said alleged will and testament, the said Junius L. Hatch, with the sole intent and design of procuring said Hannah G. Ingram to make said alleged will and testament, had professed great friendship for said Hannah G. Ingram, and by divers acts and practices unknown to these contestants acquired an ascendency, influence and control over said Hannah G. Ingram, and over her mind and will; that prior to and at the time of making said alleged will and testament, said Junius L. Hatch importuned her to make and execute the same, and himself wrote the same and presented the same to her and urged and importuned her to sign the same; and that owing to her said condition of mind and the influence and control which he, said Junius L. Hatch, had over her, she, the said Hannah G. Ingram, was unable to resist the said importunity of said Junius L. Hatch, and signed said alleged will and instrument.' "

To both and to each of these contests or oppositions answer was made by Junius L. Hatch, the proponent of the will, specifically denying all the allegations of the respective oppositions or contests, and the issues thus joined came up for trial before the court, a jury having been expressly waived in open court, on September 29, 1886, and it was consented in open court that the two contests be consolidated for the purposes of the trial.

The issues to which response must be made are reduced by the evidence to two: insanity and undue influence.

(1) Was the testatrix the victim of an insane delusion, and was this will the product of that delusion?

(2) Was the testatrix unduly influenced by Dr. Hatch to make this will?

As to the first of these questions—Was there an insane delusion, and was this will the product of that delusion?— we must first settle what constitutes an insane delusion according to the law, and the decisions of the courts declaring the law; and this is included within the general question as to mental competency.

.

The law of our state provides that every person over the age of eighteen years, of sound mind, may, by last will, dispose of all his estate, real and personal, chargeable, however, with the payment of all his debts: Civ. Çode, sec. 1270.

A person is of sound and disposing mind who is in the possession of all the natural mental faculties of man, free from delusion, and capable of rationally thinking, reasoning, acting and determining for himself. A sound mind is one wholly free from delusion. Weak minds differ from strong minds only in the extent and power of their faculties; unless they betray symptoms of delusion their soundness cannot be questioned. It is not the strength of a mind which determines its freedom from delusion, it is its soundness. Thus, it is often said that such or such a distinguished man has a sound mind; yet a man in the plainer walks of life, of faculties of less extent or power, may be equally sound. The latter is of sound mind equally with the former, if free from delusions. Delusion of mind is to an extent insanity. The main character of insanity, in a legal view, is said to be the existence of a delusion, that is, that a person should pertinaciously believe something to exist which does not exist, and that he should act upon that belief. Belief of things which are entirely without foundation in fact, and which no sane person would believe, is insane delusion; that is, when a person believes things to exist only, or at least in that degree only, in his own imagination, and of the nonexistence of which neither argument nor proof can convince him, that person is of unsound mind. If he be under a delusion, though there be but partial insanity, yet if it be in relation to the act in question, it will defeat a will which is the direct offspring of that partial insanity. Thus, in one case, where the testator conceived the groundless delusion that his nephew had conspired to effect his death, the will was set aside. On the other hand, in Clapp v. Fullerton, 34 N. Y. 190, 90 Am. Dec. 681, it was held that the will could not be rejected on the ground that the testator entertained the idea that one of his daughters was illegitimate, if this belief was not founded on insane delusion, but upon slight and insufficient evidence acting upon a jealous and suspicious mind. Belief based on evidence, however

slight, is not delusion. One person, from extreme caution or from a naturally doubtful frame of mind, will require proof before acting, amounting, perhaps, to demonstration; while another, of different faculties but of equally sound mind, will act upon very slight evidence. Delusion rests upon no evidence whatever; it is based on mere surmise: Estate of Tittel, Myr. 12; Estate of Black, Myr. 24.

To apply these general principles to the case in hand: If Mrs. Ingram believed that her husband, John W. Ingram, was unfaithful to her, and if the belief of his infidelity was entirely without foundation in fact; if the belief was the product of her own imagination; and if the paper here propounded as her will was made under such belief; and if she was influenced and controlled by such belief in making it, then she was not of sound mind, but was under a delusion, and the paper, so far, is not her will.

Did any fact exist which could cause a sane mind to believe that such was the case? If any fact did so exist, she was not laboring under a delusion regarding the same. If any fact existed, and was known to her, upon which she could base such a suspicion of her husband's fidelity, she was not laboring under a delusion respecting the same. A person may act upon weak testimony, yet be under no delusion. If the court finds that no fact existed upon which a sane mind would form such a belief as is imputed to the testatrix, then she was under an insane delusion, and the court is bound to find that this is not a valid will.

John W. Ingram, one of the contestants, when about twenty-six years of age, intermarried with the widow Wilson, July 30, 1884, she being about forty years his senior, or say sixty-five years of age. He had been brought up from about his tenth year by herself and her former husband, John D. Wilson, who had practically, but not statutorily, adopted him as their son. She had a considerable property, and it is in testimony that one reason why she married her adopted son was to secure to him firmly his rights of property. She appears to have had more than a mother's fondness for him, since it appears in evidence she was intensely jealous of him, a jealousy apparently more conjugal than maternal. Why she should have been ap-

prehensive that he would attract more than ordinary interest, or inspire unusual affection in the heart of other women, is not clear to the mind of the court, which must depend upon normal conditions for its conclusions. Prior to Ingram's marriage to the deceased, it appears he had suffered a brief experience of like character with a lady, from whom, after six weeks of cohabitation, he had been divorced upon his own application upon the ground of extreme cruelty.

Ingram was a plumber by trade, and seems to have pursued his calling with reasonable diligence; in his work it appears he was often embarrassed by the attentions of his wife, the testatrix, who followed him about, and by her unusual conduct annoyed his fellow-workmen; one of his employers testified that he was a nice, quiet man, but the employer was compelled to discharge him several times, because Mrs. Ingram was in the habit of coming around and bothering her husband on account of a "Spanish woman," whom she imagined to be after him. Upon this subject of this "Spanish woman" the case as to insane delusion rests. All the witnesses testify that, while upon the other subjects she acted in a fairly rational manner, she labored under hallucinations, fixed false ideas (testimony of Hollwege and others) as to the "Spanish woman"; she never tired of this topic; and the almost uniform testimony is that she was not in her right mind on the question of the "Spanish woman."

See testimony of P. R. O'Brien, James Watson, Andrew T. Field, J. H. Williams, Thomas O'Brien, Mrs. Stangenberger, Lottie M. Golden, Mrs. Letitia Ralph, Patrick Lee, Charles C. Levy, W. H. Allen, George Dixon, Joseph Buckley, Andrew McKinnon, Officer T. A. McKinnon, E. M. Gallagher, William G. Thomas, John Evans, Benjamin Davis, Guillaume Abadie, Mrs. Ida Carpenter, John W. Shields, George H. Perry, Dr. S. S. Stambaugh, Miss Frances Pratt (the "Spanish woman"), and her mother, Mrs. Josephine Pratt.

The burden of proof is upon the party alleging insanity or insane delusion. The reports have rarely furnished a case in which the weight of evidence is stronger in favor

of such an allegation than the one here presented. That the testatrix was under an insane delusion with regard to the "Spanish woman," which delusion controlled her in disposing of her property, and that that delusion was fostered by Dr. Hatch, I have no manner of doubt. It seems to me impossible to go through the evidence, upon a reexamination, without reaffirming the conviction that I suggested when the case was submitted, that the testatrix was the victim of an insane delusion, of which the instrument here propounded was the offspring. There is not an atom of evidence that her husband was unfaithful, not an iota of testimony that the young woman, Miss Pratt, the "Spanish woman," was the cause of the jealousy of the decedent, and, as all the counsel conceded at the trial, there is the highest degree of improbability that she should have been the active cause of provoking the jealousy with regard to Ingram; moreover it does appear, without contradiction, that she was a total stranger to all the parties concerned, and an innocent victim of a most extraordinary persecution. The deceased testatrix had absolutely nothing upon which to base her suspicion of the infidelity of her husband, and of the complicity of Miss Pratt, and the testimony of Mrs. Humphreys weighs not even a feather in the scale against the overwhelming evidence to the contrary; there is not, as counsel for proponent insists, in favor of this theory, even one of those

> "Trifles light as air, which
> Are, to the jealous, confirmation strong
> As proofs of holy writ."
> —OTHELLO, Act III, Scene 3.

There was every reason, in the natural order, why Ingram should have been the object of her bounty. The testimony of most of the witnesses, disinterested and unimpeached, was to the effect that she had contracted this otherwise incongruous and unnatural alliance in order to secure to her and her deceased husband's adopted child "his rights of property." (See testimony, uncontradicted, of witnesses for contestant.) Amid all her vagaries and eccentricities there stood out, in clear lines, affection for this young man; nothing but the wholly imaginary "Span-

ish woman'' interfered with her intention to make him the beneficiary of her bounty, and it would be a ''judicial outrage,'' as intimated by one of the counsel, to defeat that marital purpose. The ''Spanish woman'' was a myth, a sheer delusion, a creature of diseased imagination, now, in the light of legal evidence, entirely dissipated.

2. Was the testatrix unduly influenced to make this will? A will produced by undue influence cannot stand. Undue influence is any kind of influence, either through fear. coercion or importunity, by which the testator is prevented from expressing his true mind. A question of this kind is not likely to arise, except in regard to persons of naturally weak mind or facile disposition, or where such has become their condition, either from age or disease. It must, of course, be an influence adequate to control the free agency of a testator. It is very properly said: ''A testator should enjoy full liberty and freedom in making his will, and possess the power to withstand all contradiction and control. That degree, therefore, of importunity or undue influence which deprives the testator of his free agency, which is such as he is too weak to resist, and will render the instrument not his free and unconstrained act, is sufficient to invalidate it.''

I have a legal right to ask of a person making his will, that he direct his property to go in any given channel, I may even urge and importune him, and if he has sufficient strength of mind to determine for himself the will is good, even though he adopt my suggestion; but if I ask or importune a weak mind, one exhausted by disease or otherwise. to such an extent that he do not have sufficient strength of mind to determine for himself, so that the proposed script expresses my views and wishes rather than his own, it is not his will. If the testatrix had sufficient memory and intelligence to fairly and rationally comprehend the effect of what she was doing, to appreciate her relations to the natural objects of her bounty, and understand the character and effect of the provisions of the will; if she had a reasonable understanding of the nature of the property she wished to dispose of, and of the persons to whom, and the manner in which she wished to distribute it, and did so express her-

self, it is good. It is not necessary that she should have acted without prompting. Importunity or influence, to have the effect of invalidating a will, must be in such a degree as to take away her free agency.

The question here is, whether at the time of executing this will Hannah G. Ingram was free to do as she pleased, or whether she was then so far under the influence of Junius L. Hatch that the will is not the act and will of Hannah G. Ingram, but is the will of Junius L. Hatch.

Undue influence has been defined by our code (Civ. Code, 1575) to consist:

1. In the use, by one in whom confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him.

2. In taking an unfair advantage of another's weakness of mind; or,

3. In taking a grossly oppressive and unfair advantage of another's necessities or distress.

On this point evidence must often be indirect and circumstantial. Naturally, persons who intend to control the actions of another, especially in the matter of the execution of wills, do not proclaim that intent. Very seldom does it occur that a direct act of influence is patent. The existence of influence must generally be gathered from circumstances, such as whether the testatrix had formerly intended a different disposition of her property; whether she was surrounded by those having an object to accomplish to the exclusion of others; whether she was of such weak mind as to be subject to influence; whether the paper offered as a will is such a paper as would probably be urged upon her by the persons surrounding her; whether they are benefited thereby to the exclusion of formerly intended beneficiaries.

Undue influence can rarely be proved by direct and positive testimony. It may be inferred from the nature of the transaction, from the true state of the affections of the testatrix, from groundless suspicions against members of her family, if any such have been proved, and from all the surrounding circumstances.

Undue influence may be defined to be that kind of influence or supremacy of one mind over another by which that other is prevented from acting according to his own wish or judgment. A testator should enjoy full liberty and freedom in making his will and possess the power to withstand all contradiction and control.

That degree, therefore, of importunity or influence which deprives the testator of his free agency, which is such as he is too weak to resist, and which renders the instrument not his free and unrestrained act, is sufficient to invalidate it.

It is only that degree of influence which deprives the testator of his free agency, and makes the will more the act of others than of himself, which will avoid it.

Neither advice, nor argument, nor persuasion would vitiate a will made freely and from conviction, though such will might not have been made but for such advice and persuasion.

Undue influence must not be such as arises from the influence of gratitude, affection or esteem; but it must be the control of another will over that of the testator, whose faculties have been so impaired as to submit to that control, so that he has ceased to be a free agent, and has quite succumbed to the power of the controlling will.

Pressure of whatever character, if so exerted as to overpower the volition without convincing the judgment, is a species of constraint under which no valid will could be made.

Undue influence may also be defined as that which compels the testator to do that which is against his will through fear or a desire of peace, or some feeling which he is unable to resist, and but for which the will would not have been made as it was.

The testator may have known what he was about when he made the will, and may have had sufficient capacity to make it; this may be true, and still, if his mind were not free to act, if it was constrained to act, or if it had become submissive to the will of another who then exercised the commanding control over the testator, by reason of which freedom of thought and action in making the will was

suppressed, under such circumstances the will should be declared invalid.

Considering together the two issues of mental soundness, and unsoundness and undue influence, it must be noted that although mere weakness of intellect does not prove undue influence, yet it may be that, in that feeble state, the testator more readily and easily becomes the victim of the improper influences of unprincipled and designing persons who see fit to practice upon him.

It may be necessary to consider what degree of influence will vitiate a will, and this depends upon the capacity, in other respects, of the testator. What would be an undue influence on one man would be no influence at all on another. A man of strong will, whose mind is in its wonted vigor, could not be shown to have been influenced by what might be such influence as to wholly invalidate the will of one whose mind has been weakened by sickness, dissipation, or age.

But as well in the case of the sick, dissipated, or aged, as in that of one in health and vigor; in the case of him whose intellect is weak, as of him whose mind is strong, that influence which will be sufficient to invalidate a will must be such as, in some degree or to some extent, to deprive the party affected thereby of his free agency, and to make the will not the product of his own untrammeled thoughts: Comstock v. Hadylone etc. Society, 8 Conn. 254, 20 Am. Dec. 100.

In all cases of this kind the validity of the will depends more upon the abuse of a controlling influence than upon the fact of its existence; more upon the fact that the testator was not fairly dealt with, and not left free to pursue his own natural and healthful instincts and reasonable desires, than that the person benefited by the will had the power to control such will.

It need not be proved that there was actual exercise of influence at the point of time the will was executed.

Influence at any time, the effect of which was to produce the will without the fair concurrence of the mind of the testator, is sufficient to void the will.

But the exercise of undue influence must be upon the very act of making the will; and must be proved, and cannot be inferred from opportunity and interest.

Undue influence must be an influence exercised in relation to the will itself, not in relation to other matters or transactions. But this principle must not be carried too far. When it is seen that, at and near the time when the will sought to be impeached was executed, the alleged testatrix was, in other important transactions, so under the influence of the persons benefited by the will, that as to them she was not a free agent, but was acting under undue control, the circumstances may be such as to fairly warrant the conclusion, even in the absence of evidence bearing directly on the execution of the will, that in regard to the will also the same influence was exercised.

We should be satisfied by a comparison of the will in all its provisions, and under all the exterior influences which were brought to bear upon its execution, with the maker of it as she then was, that such a will could not be the result of the free and uncontrolled action of such a person so operated upon, before it can be declared invalid.

All influence is not undue influence. The procuring a will to be made, unless by foul means, is nothing against its validity. A man may by fair argument and persuasion, or even by flattery, induce another to make a will, and even to make it in his favor.

If the testator act upon the suggestion of others, this will not invalidate the will, if there be no evidence of improper dealing or undue influence.

On this subject no distinct or precise line can be drawn. It is enough to say, that the influence exercised must be an unlawful importunity on account of the manner or mode of its exertion, and by reason of which the testatrix's mind was so embarrassed and restrained in its operation that she was not mistress of her own opinions in respect to the disposition of her estate. The only inquiry for the court is, was the testatrix, from infirmity or age, or other cause, constrained to act against her will, to do that which she was unable to refuse by importunity or threats, or any other way, by which

one acquires dominion and control over another? If so, validity of the will may be impeached.

It is not possible to define or describe with exactness what influence amounts to undue influence in the sense of the law; this can only be done in general and approximate terms. In each case the decision must be arrived at by application of these general principles to the special facts and surroundings in the case.

No influence can be considered as undue influence which does not overpower the inclinations and judgment of the testatrix, and induce a disposition of her property contrary to her own wishes and desires.

Undue influence cannot be presumed, but must be proved in each case; and the burden of proving it lies on the party alleging it.

Undue influence is not a presumption, but a conclusion from the facts and circumstances proved.

In Children's Aid Society v. Loveridge (70 N. Y. 387), Miller, J., said:

"The position of the contestant is that the execution of the will was procured by the exercise of undue influence on the part of those who were the beneficiaries, and who, at the very time of the making of the same, were possessed of her confidence and surrounded her.

"In order to avoid a will upon any such ground, it must be shown that the influence exercised amounted to a moral coercion which restrained independent action and destroyed free agency, or which, by importunity which could not be resisted, constrained the testatrix to do that which was against her will, but which she was unable to refuse or too weak to resist.

"It must not be the promptings of affection; the desire of gratifying the wishes of another; the ties of attachment arising from consanguinity, or the memory of kind acts and friendly offices, but a coercion produced by importunity, or by a silent, resistless power which the strong will often exercise over the weak and infirm, and which could not be resisted, so that the motive was tantamount to force or fear."

To sum up the elements which go to constitute undue influence, the facts proved must be such as:

1. To destroy the freedom of the will of testatrix, and thus render her act obviously more the offspring of the will of others than of her own.

2. That it must be an undue influence specially directed toward the object of procuring a will in favor of the particular parties.

3. If any degree of free agency or capacity remained in the testatrix, so that when left to herself she was capable of making a valid will, then the influence which so controls her as to render her making a will of no effect, must be such as was intended to mislead her to the extent of making a will essentially contrary to her duty; and it must have proved successful to some extent, certainly: 1 Redfield on Wills, 523, 524; 1 Jarman on Wills; Reynolds v. Root, 62 Barb. 250; 2 Phill. 449-451; Gardiner v. Gardiner, 34 N. Y. 155; Saunders' Appeal, 54 Conn. 108, 6 Atl. 185; Disbrow's Estate, 58 Mich. 96, 24 N. W. 624 (see notes to this case, p. 629); Maynard v. Vinton, 59 Mich. 139, 60 Am. Rep. 27, 26 N. W. 401; Estate of Tittel, Myr. 16; Estate of Black, Myr. 31; Waterman v. Whitney, 11 N. Y. 165, 62 Am. Dec. 71.

Having stated these legal propositions, their application to the facts in controversy remains to be seen. Had Mrs. Ingram, at the time this instrument was executed, sufficient memory to fairly and rationally comprehend the effect of what she was doing? Did she understand and appreciate her relations to her husband and her relatives? And did she understand the character and effect of the provisions of the will? Did she have a reasonable understanding of the nature of the property to be disposed of, and of the persons to whom she wished to distribute it? Did she exercise her own choice and did she express her own wishes? If she did have such understanding, she had the legal right to make any disposition of her property that she pleased.

If she acted freely and with proper understanding, she had a legal right to ignore her husband and all her kin —"to cut them off with a shilling"—and send her property to strangers. Neither courts nor juries can say whether

this legacy or that is a prudent or wise one to make; by attempting to do so we should attempt to make our will take the place of that of the testatrix. Such an instrument should not be lightly set aside. It is only when the court is brought irresistibly to the conclusion, from the evidence, that the will proffered for probate was procured by the application of a dominant and controlling intelligence to an inferior understanding or a feebler will in an improper manner, that the instrument will be declared void.

The proponent of this instrument, Junius L. Hatch, is a keen, shrewd, cool man of a large and varied experience and extensive worldly knowledge, a fair judge of human nature, with quick perceptions of the weak points of his fellow-mortals; ready to seize advantages, and steadfast in holding on; in address plausible, in deportment perfect, in manner insinuating, in aspect benevolent; in all exterior attributes calculated to secure the trust of a woman whose mind was weakened by the natural advance of senility and tainted by the disease of jealousy.

Take such a man, as his counsel describes him, with his manner and demeanor, and everything bearing the impress of truth; his actions invested with the appearance of honesty, his utterance sympathetic and apparently sincere; an outward seeming of candor, calmness and consistency; qualities which indicated a man of humane heart, kindly nature and disinterested disposition. It was natural he should have made a deep impression upon the morbid mind of this aged woman. Once he discovered the vulnerable point in her character, he operated adroitly and persistently. As against the clever intrigues of such a man, the imperfect intellect and infirm purpose of the youthful husband of this old lady had no prospect of success. From the moment Junius L. Hatch first met Hannah G. Ingram, the young husband was deposed, his authority was gone, and to it succeeded the paramount influence of a will strong and resolute, an intelligence always alert and vigilant in the prosecution of the design to gain the confidence and to control the fortune of Hannah G. Ingram. Between these two men there is the strongest contrast of character and culture. The career of Hatch was

that of a man of great adaptability to changing circumstances. At this time, in his sixty-second year, he has been actively employed in the ministry of the gospel, in the civil service of the government, in the profession of a school teacher, also as a journalist, being both an editorial writer and a newspaper reporter. The title of ''doctor,'' by which he is often described, he disclaims. He was regularly ordained at Gloucester, Massachusetts, and for several years had charge of a Congregational church. Changing his religious views, he became a Unitarian minister, and accepted a settlement over a Unitarian church in Massachusetts and in New Hampshire, which he retained for about ten years. The last charge he undertook was in San Jose in 1882, which charge he voluntarily relinquished, because of inadequacy of remuneration. Subsequently he taught in the public schools, and privately, for a number of years. Thereafter he became a clerk in the custom-house of this port, and finally engaged in journalism, which is his present occupation.

It was while plying his vocation as a journalist, acting as a reporter for the ''Morning Call'' newspaper, that he first encountered Mrs. Ingram, pending an inquiry into her sanity in this court and department. He was sent by his employer to interview her, to ascertain if, according to his opinion, she was insane. Upon that occasion he had an hour's interview with her. He called again the next day, and after that saw her every day or two for several weeks. These visits were made, according to his story, at her special instance and request. Complying with her desire, he wrote articles to correct public opinion as to her case, which articles he caused to be inserted in various newspapers. His visits were continued by her wish, because she felt she needed a friend for counsel and advice, and she had confidence in Dr. Hatch. Their relations became very friendly and confidential. She visited his family sometimes, and occasionally his daughter visited her, and she expressed herself as grateful for the kindness of his daughter in sending her delicacies during her illness.

Dr. Hatch was assiduous in his attentions to Mrs. Ingram being sometimes as frequent in his visitations as three or

four times a day, and the result of his visits seems to have been a fastening of the delusion in her mind that her husband was unfaithful to her, principally with the "Spanish woman," otherwise Miss Pratt.

It is in evidence that Dr. Hatch himself said that he had no doubt that there was truth in the "Spanish woman's" story; that he had followed it up and found some basis for it; and he also declared to one of the witnesses (see evidence of George H. Perry) that Ingram was a lazy, shiftless fellow, and that he had abused his wife.

While he denies that he ever said or did anything to encourage her in her impressions about her husband, it is difficult to reconcile this statement with the declarations just adverted to, made to witness Perry, and with the strain and tenor of the letter from him, dated San Francisco, January 28, 1886, to Ingram.

(See Exhibit "F," a printed copy of which is here inserted, as well as the letter to which it is an answer.)

### EXHIBIT "D."

The first letter from Ingram to Rev. Dr. Hatch reads:

"San Francisco, Jan. 22d, 1886.

"Mr. Hatch:—The snake in the grass, you are a lier, a villian and a coward of the deepest die. You put a piece in the papers about me, and you lied when you did it. You have been trying to seperate me and my wife by lieing to her about the spanish woman, you are a dam lier of the worst kind. I defy you or anyone to prove that I know that spanish woman or had anything to do with her you are trying to separate my wife and me so you can get hold of her proporate. I tell you, you shall not get hold of her proporate as long as I live. I am not afraid of you or your kind in Court or out. I will make your grey hairs stand on ends when I get you in Court. You dare not tell me to my face what you are and have been telling in this city about me. they know you are after my wife properately and lieing about me and now do your damist you are a black villian and a coward and a pretendend friend. you mean low life scoundle you can fine me at 754 Folsom st at night or at Scott and Clay st in the

day time. I defy you to face me like a man and tell to my face the lies you are telling I will handle you Hatch in a differend way that I did Abbott which will be in Court I will fight you face to face in any proceeding that you wish to take I am working steady and am not a loafer as you say I am. You mean low life villian you will have to prove all those things if you do not think I can put you behind with your grey hairs behind the bars as people has been trying to do with me. I defy you to starte in.

"From JOHN W. INGRAM,

"754 Folsom st."

EXHIBIT "F."

The answer of Rev. Dr. Hatch to Ingram's epistle reads:

"San Francisco, January 28, 1896.

"John W. Ingram:—Your very abusive and insulting letter is really unworthy of notice or reply, but I have concluded to answer it so far as to remind you that you have never received anything but kindness from me, and to say that your language to me is, therefore, particularly discreditable to you. 'Ingratitude is a monster,' and you are certainly monstrously ungrateful for the many favors I have done you, from the day I first saw you behind the bars in the city prison, to the last time, when I gave you money to pay for food and lodging.

"Have you forgotten who it was that exerted himself to assist your wife's heroic efforts to save you from a felon's cell at San Quentin, where, but for us, you would probably at this time be wearing motley prison garb and serving out a sentence of fourteen years? Have you forgotten that when there was a possibility that you might be let off with a fine of $500—I say, have you forgotten who it was stood ready with his $500 to pay that fine? And when you had to go to jail, instead, have you no recollection who bought a bed and other things to make you comfortable? And, when Mrs. Ingram could not be admitted after hours, who used his privilege as a reporter to carry you in food, fruit, etc.?

"Is it possible, Ingram, that your memory is so treacherous and that you have really forgotten also the many

favors I have done you since your discharge, taking your property out of pawn repeatedly; letting you have money as you needed, and, when you had no work, going round to one shop after another to get it for you? Or is it possible that, with all these favors in your mind, as you have repeatedly acknowledged them to me in the strongest terms, declaring that you would never, never forget my kindness, would return it whenever you could, and be my friend for life, you turn on me in this abusive way? You remind me of the venomous reptile the farmer found almost dead with cold in the field. Moved with compassion, he carried it home and warmed it at his hearth, when it turned its fangs on its benefactor and stung him for his pains.

"But why should I expect you to be grateful to me when you have been ungrateful to your generous and long-suffering wife? Why kind to me when you have been so cruel to her, who has done so much more for you than I? You falsely charge me with having tried to separate you and her. On the contrary, I have always tried, when you had estranged her from you by your bad conduct and your exasperating taunts about being 'crazy,' etc.; I have tried, I say, to smooth over matters and keep you together. You pretend to think me actuated by mercenary and selfish motives—judging me by yourself, probably, for you have thrown off the mask now completely, and in the letter you wrote me, as well as in the letter you wrote her, you show clearly that your great anxiety is to get hold in some way of her property, which she is determined you shall never do, after treating her as you have, and I cannot blame her for it.

"Instead of going to work and keeping to work and repaying her, as you promised, a part at least of the expense you had been to her, you have not earned your board since you got out of jail, but have been an additional expense and burden to her.

"I did not call you a 'loafer,' but I did say you seemed to prefer to live on your wife's slender income without work rather than to work and earn your own living, and I say so still.

"The proposition you have repeatedly made to her that you would go to work and give her your wages if she would deed the property to you, or have the deed made out in your names together, shows your disposition plainly enough. If you had not been so greedy and avaricious, you would have fared much better, probably. With regard to what you say of the woman Pratt, Mrs. Ingram showed me a note, written by you while you were in jail, acknowledging that what she (Mrs. Ingram) had said about the woman and of your relations with her (Pratt) was all true, and at her request I carried an item to that effect to the paper. She has that note in her possession still, and the handwriting is unmistakably yours. You have made the last year and more of your wife's life very unhappy, and the disease under which she is now suffering severely, and which may terminate fatally, I have every reason to believe was brought on by mental worry on your account. I have done all I could for her comfort and relief, and shall continue to do as long as she lives. I have never given her an unkind word or worried her by an unkind act. It were well for your peace of mind, methinks, if you could say the same. She does not wish to see you at present, and has enjoined me not to inform you where she is, lest you should trouble and annoy her, as you did the last time she saw you. When she wishes to see you I will notify you, and she can tell you, if she has not already told you, that I have never sought to influence her against you, or with regard to the disposition of her property.

"I hold a note signed jointly by you and her for one hundred ·and some odd dollars, on which she has paid me sixty dollars. The remainder you promised to pay from your earnings, with other moneys advanced since you were living with her on O'Farrell and Polk streets. You kept an account of this, I believe, and, if I am not mistaken, it amounts to about thirty dollars. You owe me five dollars more on your watch chain, which I took out of pawn for the third time, and which I hold as security for the debt. If you mean to be honest with me you will pay me out of your wages as soon as you can. I will charge you no interest if you do that, and will hold the chain for you.

"I am glad you are at work, as you say your are, and hope you will keep at it, and show by your future conduct that you are determined to redeem your character. and live so that you will have no occasion to be ashamed of yourself in the future. If any person, man or woman, advises you to any other course, and tries to induce you to attempt to get possession of your wife's property, by force or by fraud, or in any way except with her free will and consent, on the ground of affection and regard, such person is a poor counselor, and your enemy instead of your friend.                              J. L. HATCH.

"P. S.—At Mrs. Ingram's request, I read the letter you sent me, and also the one you sent her, to her, and I have also read to her this reply. She says I have spoken the truth, but have put it more mildly than she would have done if writing to you. You have my permission to read this letter to Mrs. Fitzgerald and her niece, or any others.
                              "J. L. H."

The association between Dr. Hatch and Mrs. Ingram, under the circumstances, was extraordinarily confidential. In all his intercourse with her he appears to have been her business adviser, and to have been substituted in her confidence, if not in her affections, for her husband. He controlled her movements; when her husband was in jail she communicated with him through Hatch; when she was finally taken sick—so sick that she had to be carried to the German Hospital—Dr. Hatch was still sedulous in his attentions to her, and in his supervision over her affairs. It was he who took her to the hospital, where, it appears, she never saw her husband. There she lay prostrated by distressing corporal maladies; she had liver trouble, liver obstruction, and jaundice, to which diseases she succumbed on the 1st of February, 1886. From the day he became acquainted with her, in December, 1884, to the day of her death, Dr. Hatch never lost sight or control of Mrs. Ingram. This is the tenor of the testimony. In all her various lodging places he was her most frequent visitor; his interviews were commonly out of the presence of her husband; even when Ingram was in the house, his wife and Hatch would

have their interview without his presence (testimony of Mrs. Golden); and it is in evidence that whereas, before Dr. Hatch's visit, she would be very friendly with her husband, or "Johnnie," as she was accustomed to call him, after Hatch's departure her manner toward "Johnnie" would change (testimony of Mrs. Carpenter). Her talk about the imaginary "Spanish woman" became, also, more pronounced at these times; "she said if her husband had not run with the 'Spanish woman,' she would leave it all (her property) to him."

That Dr. Hatch did not discourage her in the entertainment of this delusion as to the "Spanish woman" is shown by the letter to Ingram, Exhibit "F," hereinbefore inserted. In this most extraordinary effusion, in reply to Ingram's accusation (Exhibit "D") that he (Hatch) had been trying to separate Ingram and wife by lying to her about the "Spanish woman," so he (Hatch) could get hold of the property, Hatch says: "With regard to what you say of the woman Pratt, Mrs. Ingram showed me a note written by you while you were in jail, acknowledging that what she (Mrs. Ingram) had said about the woman and of your relations with her (Pratt) was all true, and at her request I carried an item to that effect to the paper. She has that note in her possession still, and the handwriting is unmistakably yours." This note, the authorship of which is here imputed to Ingram, but which is denied by him, was not produced on the trial. It was not found among her papers, and its nonproduction is significant. In the same connection the postscript to this letter from Hatch is noteworthy. "P. S.—At Mrs. Ingram's request, I read the letter you sent me, and also the one you sent her, to her; and I have also read to her this reply. She says I have spoken the truth, but have put it more mildly than she would have done if writing to you."

Whatever may be said of Dr. Hatch's letter, Exhibit "F," it can hardly be accused of drawing it mild. This letter certainly speaks for itself, and it is of great consequence in showing the closeness of his relation to and the strength of his influence over the wife of Ingram. What was the object of his frequent visits to Mrs. Ingram? It

was all business. Although, by virtue of his sacerdotal calling, he might have administered to her spiritual consolation, no hint of such ministration is shown by the evidence; no such suggestion is contained in the letter to Ingram (Exhibit "F"); nowhere does it appear that in Dr. Hatch's mind was there aught but business; "property" is his overmastering idea, his ruling thought in all his intercourse and correspondence with the Ingrams. In his letter to Ingram (Exhibit "F") he says: "If any person, man or woman, advises you to any other course, and tries to induce you to get possession of your wife's property, by force or by fraud, or in any way except with her free will and consent, on the ground of affection and regard, such person is a poor counselor, and your enemy instead of your friend." In this curious contribution to the literature of will contests, it is difficult to discern the spiritual element. It is of the earth, earthy.

But how came the will into existence? One day, about the middle of February, 1885, according to Dr. Hatch's testimony, he called upon Mrs. Ingram; she gave him some "specifications" from which he was to draw up the form; he did so, he did not write the specifications. Who did? His son, William K. Hatch, a young man of twenty-one years of age, who never thitherto had drawn a will—a baggage and brakeman on the railroad—it was this inexperienced youth who was selected to take down the "memoranda" from which the will was elaborated. He purchased the blank form, and from the "specifications" or "memoranda" the will was drawn by Junius L. Hatch, the proponent, the principal beneficiary, residuary legatee, and executor. Where are the "specifications" or "memoranda"? Their nonproduction must be regarded as important. Who so much interested in their preservation and production as the proponent? It was in his power to preserve this paper; it was his interest to produce it; and the circumstance that it is not preserved and produced must tell against him. The will itself is filled out in a printed form, the filling being in his handwriting, and the inspection of the paper shows that it was carefully drawn in his interest. If drawn from the "specifications" dictated by her to a youth

who had no experience in drawing wills, presumably unfamiliar with technical legal terms, it is strange that such exactitude of legal expression should obtain, as is particularly shown in the paragraph "Eighthly," in words as follows: "I hereby give, devise and bequeath to Junius L. Hatch, journalist, now of the City and County of San Francisco, my house and lot, No. 1724 Hyde street, including the cottage in the rear, now numbered 1235 Vallejo street; *and I do also hereby make the said Junius L. Hatch my residuary legatee.*" It is hard to believe that this residuary clause came from the lips of the decedent, and was set down in such terms by the inexperienced hand of the young man who had never before drawn a will; and the appearance of the script adds to the improbability of such fact, and strengthens the impression that it was the inspiration and the act of the proponent of this instrument. While he disclaims having anything to do with the dictating of the terms of that instrument, his own son testifies that he (the son) went to Mrs. Ingram at the request of his father, and then from her instructions prepared the "memoranda" for the will. The proponent testifies that before Mrs. Ingram went to Paso Robles Springs, she told him what she had determined to do about her property, because of her husband's infidelity and his ill-treatment of her; she also spoke of the Cloughs, her nephews, and their conduct.

To corroborate his statements that he had nothing to do with the disposition of the property, he introduces a witness, Dr. Thomas Grant, who testified that he knew Mrs. Ingram, and also Dr. Hatch, the latter of whom lived in the same house for awhile with them. Grant saw Mrs. Ingram on Polk street before she went to Paso Robles Springs, and she said she had everything all fixed in case she did not come back; she left everything to Dr. Hatch, he and his family had been kind to her; only $5 to her husband; he had been unkind to her; all he wanted was her property; he had tried to get her in the asylum; she left $5 each to her nephews; they had been unkind; this was about the sum and substance of what she said to the witness Grant, according to his testimony. She asked him to remember what she told him in case she didn't come back from the springs. Upon the

cross-examination of this witness it appeared that his relations with Dr. Hatch were quite friendly, and that he went to see Mrs. Ingram at the instance of and in company with him. What was the purpose of this joint visit? Although this witness, according to his statement, had been at one time a regular physician, it is many years since he pursued that calling as a profession, and not at all in this city, his nearest connection with the practice being that he deals in medicines in a small way, being occupied at other times in the building of houses, and his medical attentions to Mrs. Ingram were of the slenderest character.

The conclusion that the court drew from his testimony was that the real object and purpose of his visit to Mrs. Ingram was to substantiate the premeditated plan of the proponent of this will: that Mrs. Ingram was acting of her own volition without restraint exercised by Dr. Hatch or any one else, and upon rational premises as against her husband and her nephews. If the deliberate design of Dr. Hatch were to prepare his proofs in advance for the establishment of this paper as a valid will, he could not have acted with greater care, the vice of his process being the excess of precaution in laying his foundations in some particulars; as, for example, in the case of the witness Grant, and the endeavor to materialize the mythical "Spanish woman"; and for other instances, see his own testimony and that of his son, and the testimony throughout.

In the infrequent intervals afforded by the other occupations of this department, and in the face of interruptions necessarily suffered by and in the discharge of other duties, I have endeavored to make a careful examination and collation of the legal principles applicable to the issues in this case, and a fair statement of the facts adduced in evidence. If there is any omission to comment upon any particular statements of witnesses, it is because I have attached more importance to what I have set down than to what I have passed by lightly or omitted to enlarge upon; but upon the whole case, as presented, I do not see how the conclusions can be escaped: (1) That at the time of making this will the testatrix was laboring under an insane delusion, and that this will was the product of that delusion; and (2)

that she was unduly influenced to make this will in favor of the proponent, Junius L. Hatch, and that, consequently, the instrument here propounded should be and it is refused admission to probate.    Let judgment be entered accordingly.

---

"An Insane Delusion is the spontaneous production of a diseased mind, leading to the belief in the existence of something which either does not exist or does not exist in the manner believed—a belief which a rational mind would not entertain, yet which is so firmly fixed that neither argument nor evidence can convince to the contrary": Estate of Kendrick, 130 Cal. 360, 62 Pac. 605; Potter v. Jones, 20 Or. 239, 25 Pac. 769, 12 L. R. A. 161; note to People v. Hubert, 63 Am. St. Rep. 30, on insane delusions. A delusion which will destroy testamentary capacity must spring up spontaneously in the mind, without extrinsic evidence of any kind to support it. If it has any foundation in fact, if it has any evidence, however slight, as its basis, it is not an insane delusion. One cannot be said to be under such a delusion if his condition of mind results from a belief or inference, however irrational or unfounded, drawn from the facts which are shown to exist: Estate of Scott, 128 Cal. 57, 60 Pac. 527; In re Cline's Will, 24 Or. 175, 41 Am. St. Rep. 851, 33 Pac. 542; Skinner v. Lewis, 40 Or. 571, 67 Pac. 951, 62 Pac. 523. Moreover, the belief must be real, not simulated; and it must be persistent, not a "fleeting vagary" or a temporary hallucination: Estate of Redfield, 116 Cal. 637, 48 Pac. 794; Estate of Caleb, 139 Cal. 673, 73 Pac. 539. And furthermore, a delusion, to be fatal to the validity of a will, must be operative in the testamentary act: Estate of Redfield, 116 Cal. 637, 48 Pac. 794; Estate of Dolbeer, 149 Cal. 227, 86 Pac. 695. It is not enough that a delusion may exist; its connection with the will must be made manifest, and shown to have influenced its provisions: Potter v. Jones, 20 Or. 239, 25 Pac. 769, 12 L. R. A. 161.

"In ordinary language, a person is said to be under delusion who entertains a false belief or opinion which he has been led to form by reason of some deception or fraud, but it is not every false or unfounded opinion which is in legal phraseology a delusion, nor is every delusion an insane delusion. If the belief or opinion has no basis in reason or probability, and is without any evidence in its support, but exists without any process of reasoning, or is the spontaneous offspring of a perverted imagination, and it is adhered to against all evidence and argument, the delusion may be truly called insane; but if there is any evidence, however slight or inconclusive, which might have a tendency to create the belief, such belief is not a delusion. One cannot be said to act under an insane delusion if his condition of mind results from a belief or inference, however

irrational or unfounded, drawn from facts which are shown to exist'':
Estate of Scott, 128 Cal. 57, 60 Pac. 527.

The Undue Influence Which Invalidates a Will must be such as
relates to the will itself, and operates upon the testator at the time
of his making the will: Estate of Kaufman, 117 Cal. 288, 59 Am.
St. Rep. 179, 49 Pac. 191; Estate of Flint, 100 Cal. 391, 34 Pac. 863;
Estate of Shell, 28 Colo. 167, 89 Am. St. Rep. 181, 63 Pac. 413, 53 L.
R. A. 387; Gwin v. Gwin, 5 Idaho, 271, 48 Pac. 295; Estate of Hol-
man, 42 Or. 345, 70 Pac. 908. General influence, not directly brought
to bear upon the testamentary act, though strong and controlling, is
not enough: Estate of McDevitt, 95 Cal. 17, 30 Pac. 101; Estate of
Black, 132 Cal. 392, 64 Pac. 695; Estate of Donovan, 140 Cal. 390,
73 Pac. 1081; In re Darst's Will, 34 Or. 58, 54 Pac. 947. The in-
fluence must be used directly to procure the will, and must amount
to coercion destroying the free agency of the testator at the time
of the execution of the instrument: Estate of Carpenter, 94 Cal. 406,
29 Pac. 1101; Estate of Motz, 136 Cal. 558, 69 Pac. 294; Estate of
Keegan, 139 Cal. 123, 72 Pac. 828; Goodwin v. Goodwin, 59 Cal. 561;
Hurley v. O'Brien, 34 Or. 58, 54 Pac. 947; Estate of Holman, 42 Or.
345, 70 Pac. 908; Waddington v. Busby, 45 N. J. Eq. 173, 14 Am. St.
Rep. 706, 16 Atl. 690.

When a Will is Contested on the Ground of Undue Influence, the
burden of proof is generally on the contestant: Estate of Motz, 136
Cal. 558, 69 Pac. 294; Estate of Latour, 140 Cal. 414, 73 Pac. 1070,
74 Pac. 441; Dausman v. Rankin, 189 Mo. 677, 107 Am. St. Rep.
391, 88 S. W. 696; note to Richmond's Appeal, 21 Am. St. Rep. 94-
104. See, however, Estate of Holman, 42 Or. 345, 70 Pac. 908. Such
influence cannot be inferred merely from opportunity and motive:
Herwick v. Langford, 108 Cal. 608, 41 Pac. 701; Estate of Nelson,
132 Cal. 182, 64 Pac. 294; Estate of Black, 132 Cal. 392, 64 Pac.
695; Estate of Donovan, 140 Cal. 390, 73 Pac. 1081; Estate of Shell,
28 Colo. 167, 89 Am. St. Rep. 181, 63 Pac. 413, 53 L. R. A. 387;
Hubbard v. Hubbard, 7 Or. 42. But while undue influence is not
presumed, still, like fraud, it rarely is susceptible of proof by direct
and positive evidence. Hence it is that courts are liberal in allow-
ing a wide range of investigation, and permitting the introduction
in evidence of all facts and circumstances, even though of slight
significance in themselves, which tend to throw light upon the is-
sue: Clough v. Clough, 10 Colo. App. 433, 51 Pac. 513; Blackman
v. Edsall, 17 Colo. App. 429, 68 Pac. 790; Estate of Shell, 28 Colo.
167, 89 Am. St. Rep. 181, 63 Pac. 413, 53 L. R. A. 387; Dausman
v. Rankin, 189 Mo. 677, 107 Am. St. Rep. 391, 88 S. W. 696. How-
ever, although circumstantial evidence may be sufficient, it must
amount to proof; and it has the force of proof only when circum-
stances are proved which are inconsistent with the claim that the
will was the spontaneous act of the testator: Estate of McDevitt,

95 Cal. 17, 30 Pac. 101; Estate of Calkins, 112 Cal. 296, 44 Pac. 577.

"The question of undue influence is one of peculiar character; it does not arise until after the death of the one who alone fully knows the influences which have produced the instrument; it does not touch the outward act, the form of the instrument, the signature, the acknowledgment; it enters the shadowy land of the mind in search of its condition and processes. . . . . This opens a broad field of inquiry and gives to such a contest over a will a wider scope of investigation than exists in ordinary litigation": Mooney v. Olsen, 22 Kan. 69, approved in Estate of Miller (Utah), 88 Pac. 338. For cases considering the sufficiency of the evidence to establish undue influence, see Estate of Welch, 6 Cal. App. 44, 91 Pac. 336; Estate of Carriger, 104 Cal. 81, 37 Pac. 785; Estate of Silvany, 127 Cal. 226, 59 Pac. 571; Estate of Kendrick, 130 Cal. 360, 62 Pac. 605; Estate of Tibbetts, 137 Cal. 123, 69 Pac. 978; Estate of Calef, 139 Cal. 676, 73 Pac. 539; Estate of Morey, 147 Cal. 495, 82 Pac. 57; Ames v. Ames, 40 Or. 495, 67 Pac. 737; Estate of Abel (Nev.), 93 Pac. 227.